# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE

In re

CHARLES L. GIVENS
dba AMERICAN HOME BUILDERS

        Debtor

RONALD D. FULLER and
JUDITH A. FULLER

        Plaintiffs

        v.

CHARLES L. GIVENS

        Defendant

Case No. 3:20-bk-30700-SHB
Chapter 7

Adv. Proc. No. 3:20-ap-3027-SHB

# **M E M O R A N D U M**

**APPEARANCES:**    KENNERLY, MONTGOMERY & FINLEY, P.C.
        Michael S. Kelley, Esq.
        Post Office Box 442
        Knoxville, Tennessee 37901-0442
        Attorneys for the Plaintiffs

        LAW OFFICES OF MAYER & NEWTON
        John P. Newton, Jr., Esq.
        1111 Northshore Drive
        Suite S-570
        Knoxville, Tennessee 37919
        Attorneys for the Defendant

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiffs filed a Complaint for Determination That Debts Are Non-Dischargeable ("Complaint") on June 15, 2020 [Doc. 1], asking the Court to determine that a judgment granted in their favor and against Defendant by the Sevier County Chancery Court in the amount of $305,756.24 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and/or (a)(6). Defendant timely answered the Complaint on July 17, 2020 [Doc. 6], denying Plaintiff's allegations of fraud and Plaintiffs' entitlement to a nondischargeable judgment against him.

Trial was held on May 12, 2021. Pursuant to the Joint Statement of the Parties filed on May 3, 2021 [Doc. 25], the sole issue before the Court is whether Plaintiffs are entitled to a determination that the state-court judgment is nondischargeable under § 523(a)(2)(A).[1] The record before the Court consists of fifteen stipulations [Doc. 25], eleven stipulated exhibits [Doc. 28],[2] and the testimony of Plaintiffs and Defendant. The Court also takes judicial notice, pursuant to Federal Rule of Evidence 201, of undisputed facts of record in Defendant's Chapter 7 bankruptcy case.

For the reasons set forth in this Memorandum, the Court finds that Plaintiffs are not entitled to a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A) and that the Judgment entered by the Sevier County Chancery Court on April 3, 2018, was discharged on August 11, 2020.

---

[1] Counsel for Plaintiffs confirmed at the pretrial status conference held on May 4, 2021, that Plaintiffs were no longer proceeding with a cause of action under 11 U.S.C. § 523(a)(6).

[2] At trial, the parties agreed to the admissibility of the exhibits tendered pretrial and submitted supplements to two of the stipulated exhibits.

## I. FINDINGS OF FACT[3]

In 2014, Plaintiffs acquired real property located at 303 Allendale Lane, Sevierville, Tennessee ("Property"). Plaintiffs found Defendant through his website for his DBA, American Home Builders. The website represented that Defendant held a Tennessee contractor's license, had 35 years' experience building homes of varying sizes, and was licensed and insured. [Ex. 1.] Defendant affirmatively represented to Plaintiffs that he was insured during their in-person consultation in February 2014, and Defendant carried a liability insurance policy as required by the State of Tennessee. [*See* Ex. 4.] On April 3, 2014, Plaintiffs contracted with Defendant to build a home on the Property for the "turn-key price of $189,800.00." [Ex. 10 ("Contract").] The Contract includes no representation that Defendant would maintain insurance of any kind, although it does require Plaintiffs "to have a fire policy in effect during construction." [Ex. 10.]

Defendant constructed Plaintiffs' home between April 2014 and March 2015, and Plaintiffs paid him $179,310.00. [Ex. 9 at pp. 64-65.] After receiving a report from the structural engineer, because there were a number of omissions or defects in the home after its construction, Plaintiffs filed suit against Defendant in the Sevier County Chancery Court on November 20, 2015, captioned *Ronald D. Fuller and Judith A. Fuller v. Charles L. Givens, dba American Home Builders*, No. 15-11-379 ("State Court Lawsuit").[4] Notwithstanding that the Contract

---

[3] This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and this Memorandum constitutes the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure (incorporating therein Federal Rule of Civil Procedure 52).

[4] At trial here, Mrs. Fuller testified that Plaintiffs spent the summer of 2015 trying to get Defendant to fix the following omissions or defects: the foundation and footers were built incorrectly; the foundation and garage were not waterproofed; the driveway and sidewalk were not countered to prevent water infiltration; the attic was insufficiently insulated; the masonry work was substandard; the porch and its foundation were not built correctly, and the front porch steps were installed incorrectly; the basement door and windows were installed incorrectly; the trusses were not cut and blocked correctly; the HVAC duct was improperly sized; the French doors were not properly installed to prevent water infiltration; the concrete basement and garage floors were installed incorrectly; the wall supports and roof were not installed properly; and water infiltrated the basement and crawl space, resulting in mold. Although the Sevier County Building Department issued a Certificate of Occupancy on April 20, 2015 [*see* Ex. 8], Plaintiffs were required to hire others to make repairs and were unable to move into the home until May 12, 2016.

price was only $189,980.00 and that Plaintiffs paid Defendant $179,310.00 towards the purchase price, based on the Report and Recommendation of the Special Master dated January 23, 2017 ("Special Master's Report") [*see* Ex. 11], which was affirmed by the Chancellor [*see* Ex. A. to Ex. 2 at p. 15, lines 15-16], Plaintiffs were awarded a judgment on April 3, 2018 ("Judgment"), in the amount of $305,756.24[5] [Doc. 25 at ¶ 14; Ex. 2], consisting of damages of $248,748.99 (determined by the Special Master as the cost of repair to the house [Ex. 11 at p. 18]), plus attorneys' fees of $38,837.25 and expert fees of $18,170.00 [Ex. A to Ex. 2 at pp. 5-7, 16].

The Special Master's Report details numerous defects with the construction and the costs for repair, relying in large part on the testimony of Plaintiffs' two expert witnesses, Jimmy Taylor, a certified professional engineer, and Kenneth Guffey, a licensed contractor. [Ex. 11.] The Special Master concluded that Plaintiffs provided "overwhelming proof that their house was constructed with numerous defects." [Ex. 11 at p. 12.] The Special Master found that, "[w]hile [Defendant] did not personally create most of the defects, as the general contractor, he is responsible for the work of his subcontractors." [*Id*. at p. 14.] The Special Master expressly concluded that "[D]efendant breached the contract by failing to build a house that met applicable codes and that also revealed widespread poor workmanship." [*Id*. at p. 12.]

Defendant filed a Chapter 7 bankruptcy petition on March 5, 2020, and received a discharge on August 11, 2020. According to the trial testimony, as of the petition date, the Judgment remained unsatisfied, except for approximately $15,865.00 that was paid from post-

---

[5] The Chancellor also ordered Defendant to pay costs to the Clerk, including $4,680.00 for the fee of the Special Master plus $2,733.00 for court reporter's fees incident to the Special Master's hearings. [Ex. 2 at ¶ 5; Ex. 3.] These court costs are not at issue in this proceeding.

judgment executions against an RV and a bank account. Plaintiffs timely initiated this adversary proceeding on June 15, 2020.

## II. LAW AND ANALYSIS

Under § 523(a)(2)(A), a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by [] false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A).[6] In short, to satisfy the statutory requirements, Plaintiffs must prove (1) that Defendant obtained money or property from or belonging to them through false pretenses and/or material misrepresentations that Defendant knew were false or that he made with gross recklessness or through actual fraud; (2) that Defendant intended to deceive Plaintiffs at the time of any such false pretenses, misrepresentations, and/or fraudulent conduct; (3) that Plaintiffs justifiably relied on Defendant's false pretenses, representations, and/or fraudulent conduct; and (4) that Plaintiffs' reliance was the proximate cause of their losses. *See Lansden v. Jones (In re Jones)*, 585 B.R. 465, 502 (Bankr. E.D. Tenn. 2018). The Court construes § 523(a) liberally in favor of Defendant and strictly against Plaintiffs, who bear the burden of proving all of the elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). "Failure to prove a single element requires a finding of dischargeability." *Signal Asset Mgmt. v. Rodriguez (In re Rodriguez)*, No. 19-81378-CRJ-7, A.P. No. 19-80063-CRJ-7, 2021 WL 1219512, at *8 (Bankr. N.D. Ala. Mar. 30, 2021). Although the parties do not dispute that Plaintiffs paid Defendant for

---

[6] "The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l. Elecs, Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

the construction of their home, thus satisfying the first element, they do dispute that the remaining elements were satisfied.

Material misrepresentations under § 523(a) are "substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003) (citations omitted); *see also McCallum v. Pixley (In re Pixley)*, 456 B.R. 770, 782 (Bankr. E.D. Mich. 2011) (defining "material fact" to require that it "must be of enough importance in the matter that a reasonable person would be likely to rely on it" (citation omitted)). Additionally, "[s]ilence regarding a material fact can constitute a false representation actionable under § 523(a)(2)(A)." *Fee v. Eccles (In re Eccles)*, 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009) (citation omitted).

False pretenses include:

> "any intentional fraud or deceit practiced by whatever method in whatever manner[, which] may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive. . . . It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully included by a debtor to transfer property or extend credit to the debtor. . . . Silence or concealment as to a material fact can constitute false pretenses."

*Ga. Dep't of Labor v. Pruitt (In re Pruitt)*, No. 16-6-862-BEM, Adv. Proc. No. 16-5237-BEM, 2017 WL 3499282, at *2 (Bankr. N.D. Ga. Aug. 14, 2017) (quoting *Taylor v. Wood (In re Wood)*, 245 F. App'x 916, 918 (11th Cir. 2007) (citations omitted)); *see also Lenchner v. Korn (In re Korn)*, 567 B.R. 280, 300 (Bankr. E.D. Mich. 2017) ("A 'false pretense' involves an implied misrepresentation or conduct intended to create or foster a false impression. . . . It has also been described as 'usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading

understanding of a transaction.'" (citations omitted)); *Argento v. Cahill (In re Cahill)*, Adv. No. 15-08298-reg, 2017 WL 713565, at *6 (Bankr. E.D.N.Y. Feb. 22, 2017) (defining "false pretenses" under § 523(a)(2)(A) as "conscious, deceptive, or misleading conduct calculated to obtain, or deprive another of property" (citations omitted)).

By contrast, a false representation is "an expressed misrepresentation." *Jennings v. Bodrick (In re Bodrick)*, 509 B.R. 843, 855 (Bankr. S.D. Ohio 2014) (citation omitted)); *see also Cody Farms, Inc. v. Deerman (In re Deerman)*, 482 B.R. 344, 367 (Bankr. D.N.M. 2012) (defining false representations as "representations knowingly and fraudulently made that give rise to the debt" (quoting *Adams Cnty. Dep't of Soc. Servs. v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 (Bankr. D. Colo. 2006) (citations omitted)). "A court can find a false representation if the plaintiff presents proof that the defendant (1) made a false or misleading statement; (2) with the intent to deceive; and (3) in order for the plaintiff to turn over money or property to the defendant." *Varble v. Chase (In re Chase)*, 372 B.R. 133, 137 (Bankr. S.D.N.Y. 2007) (citations omitted). The false statement also must be material, *i.e.*, it must contain "substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision . . . [but] is not material if the creditor knows it is false or possesses information sufficient to call the representation into question." *In re Copeland*, 291 B.R. at 791 (citations and quotation marks omitted). "[T]he test for materiality is not whether the [creditor] *actually* relied on the false statement, but whether the statement was *capable of influencing*, or had a natural tendency to influence, the [creditor's] decision." *United States v. Keefer*, 799 F.2d 1115, 1127 (6th Cir. 1986).

Both "'[f]alse representations and pretenses encompass statements that falsely purport to depict current or past facts[,]'" *In re Copeland*, 291 B.R. at 760 (quoting *Peoples Sec. Fin. Co.,*

*Inc. v. Todd (In re Todd),* 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983)). Courts, however, "ordinarily distinguish a knowing misstatement of a prior fact, which ordinarily falls within § 523(a)(2)(A), and a promise of future performance that is subsequently not performed, which ordinarily does not." *Bohannon v. Horton (In re Horton)*, 372 B.R. 349, 357 (Bankr. W.D. Ky. 2007). Additionally, false representations and false pretenses are exclusive causes of action because "a 'false pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an *express* misrepresentation." *Ozburn v. Moore (In re Moore),* 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002) (quoting *Sears Roebuck & Co. v. Faulk (In re Faulk),* 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)) (emphasis added).

> The element distinguishing a false representation from a false pretense is an explicit, definable statement by the debtor that results in a misrepresentation. A false pretense, on the other hand is conduct by the debtor that implies or promotes a scheme that is misleading. While most times both conduct and explicit statements by the debtor exist, thereby establishing a fraud under both false pretenses and false representation, the creditor may be able to establish the debtor's conduct without a showing of explicit statements or explicit statements without a showing of the debtor's conduct and still be successful under § 523(a)(2)(A).

*In re Cahill*, 2017 WL 713565, at *6 (citations omitted).

Notably, mere breach of contract, even intentional, does not rise to the level required for a determination of nondischargeability under § 523(a)(2). Thus, "a contractor's failure to perform as promised, standing alone, gives rise to a claim for breach of contract, but not actionable fraud, misrepresentation or false pretenses under section 523(a)(2)(A) . . . . [I]f[, however,] a debtor makes an intentional misrepresentation, such as overstating his qualifications when soliciting or obtaining the work, a subsequent breach of the contract may result in a nondischargeable debt." *Clark v. McCurdy (In re McCurdy)*, No. 17-80033, Adv. No. 17-8016,

2019 WL 2343773, at *6 (Bankr. C.D. Ill. May 31, 2019). As recently summarized by the Bankruptcy Court for the District of New Jersey:

> In cases involving a debtor-contractor, . . . courts . . . have generally recognized "two ways to establish misrepresentations or fraud under section 523(a)(2)(A): (1) to show that the contractor executed the contract never intending to comply with its terms; or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work." *Boccella v. Purington (In re Purington)*, No. 11-11617/JHW, Adv. No. 11-1757, 2012 WL 1945510, at *10 (Bankr. D.N.J. May 30, 2012) (citing *Merritt v. Wiszniewski (In re Wiszniewski)*, No. 09-11102, Adv. No. 09-00524, 2010 WL 3488960, *5 (Bankr. N.D. Ill. Aug. 31, 2010)); *see also e.g.*, *Dunlop v. Chung-Hwan Kim (In re Chung-Hwan Kim)*, No. 12-30363 VFP, Adv. No. 12-2140 VFP, 2018 WL 671467, at *22 (Bankr. D.N.J. Jan. 31, 2018); *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172 (Bankr. E.D. Pa. 2006). In the debtor-contractor context, general representations about expected work performance or poor quality of work (without something more) merely give rise to a breach of contract action and will not suffice to constitute misrepresentation under § 523(a)(2)(A). *See In re Chung-Hwan Kim*, 2018 WL 671467, at *22; *Lewandowski v. Moeller (In re Moeller)*, No. 09-17417 (GMB), Adv. No. 11-1008 (GMB), 2014 WL 1315854, at *6 (Bankr. D.N.J. Mar. 31, 2014); *In re Purington*, 2012 WL 1945510, at *10.

*Coluccio v. Sevatakis (In re Sevastakis)*, 591 B.R. 197, 203 (Bankr. D.N.J. 2018).

In their Complaint, Plaintiffs alleged the following concerning Defendant's purported misrepresentations and their reliance thereon:

> 12. At all relevant times, Defendant maintained a website (the "Website") on which his business was advertised.
>
> 13. The website touted the qualifications and experience of Defendant. Among the statements on the Website was the following:
>
>> We have been building homes for over 35 years and as a family owned and operated business, we keep family and Godly values at the center of our business. We ensure friendly customer service, quality work, and value in all we do.
>
> 14. In addition, the Website represented: "We are [']experienced and know what it takes to complete a home of all shapes and sizes with excellence.[']"
>
> 15. Of particular relevance to this case, the Website assured potential customers that Defendant was not only licensed but also insured. The Website stated: "We

are licensed and insured, giving you peace of mind." This representation was repeated on the side panel of this page using the words *Licensed & Insured*.

16. During late February[] 2014, Plaintiffs became aware of Defendant, read the information contained on the Website, and met with Defendant in person. In the meeting, Plaintiffs expressly asked Defendant if he had insurance. Consistent with the representation on the Website, Defendant affirmatively and unequivocally represented that he did, in fact, have insurance. That statement was false.

17. Having had no previous experience with Defendant, Plaintiffs were particularly sensitive to the need for insurance in the event of problems with the construction of their new home. But for this representation, Plaintiffs never would have hired Defendant as their builder.

[Doc. 1 at ¶¶ 12-16.]

Mr. Fuller testified at trial that he first met Defendant in March 2014, when Plaintiffs toured a home that Defendant was building for others. Mr. Fuller testified that he spoke with Defendant about a number of things, including whether Defendant had been involved in prior lawsuits and whether Defendant was insured for workmanship, and Defendant told Mr. Fuller "not to worry about it" because he was covered. During her testimony about this meeting, Mrs. Fuller stated that Mr. Fuller and Defendant stepped away from her during their discussion and that although she could not hear what they were saying, Mr. Fuller later relayed to her that Defendant said that he stood by his work and was insured. Additionally, both Plaintiffs testified that Defendant's representations on his website about Godly values and that he was family-oriented meant that they could trust him, that they did not think that he would act fraudulently, and that his claim that he was insured gave them "peace of mind." Mrs. Fuller also testified that she did not believe that she would have signed the Contract without an assurance from Defendant that he was insured, and Mr. Fuller likewise testified that he would not have entered into the Contract had Defendant not made the representations about being insured.

During his testimony, Defendant stated that he has never had workmanship insurance and that he was not sure if that type of insurance even exists. He stated that all of his references to insurance related to liability insurance that he was required to maintain by the State of Tennessee. [*See* Ex. 4.] Defendant also testified that although he met Mr. Fuller once in March before the Contract was signed in April, most of his communications and dealings before and during construction occurred with Mrs. Fuller, and he introduced into evidence a collective exhibit of emails between himself and Mrs. Fuller defining what Plaintiffs wanted in the house, price changes, and general information. [*See* Ex. 7A.]

In *Sims v. Roggasch (In re Roggasch)*, 494 B.R. 398 (Bankr. E.D. Ark. 2013), the court examined similar facts and determined that the plaintiffs did not meet their burden of proof at trial as to a representation about workmanship insurance. There, the plaintiffs had filed a state-court lawsuit against the defendant-debtor, who was a contractor, alleging breach of contract, breach of implied warranties, negligence, and violation of the Arkansas Deceptive Trade Practices Act because he had "misrepresented that he had insurance that covered 'negligent workmanship' and that he, in fact, had no such insurance[.]" *Id*. at 404. Following a jury verdict in favor of the plaintiffs, judgment was entered against the defendant-debtor. *Id*. After the defendant-debtor filed for bankruptcy, the plaintiffs sought, among other things, a determination of nondischargeability based on the judgment, arguing false misrepresentation with an intent to deceive and specifically arguing that the defendant-debtor "misrepresented . . . that his work was covered 'under insurance and bond[.]'" *Id*. at 405.

In its analysis under § 523(a)(2)(A), the bankruptcy court first rejected the plaintiffs' argument that because the state court found the defendant-debtor had violated the Arkansas Deceptive Trade Practices Act, the requisite findings of fraud had been established. The

bankruptcy court found that other than a reference to the deceptive-trade-practice theory, the jury was not instructed on the elements of fraud so that "a determination of fraud was not essential to the judgment[.]" *Id*. at 407. The court then reiterated that "breach of contract or negligence alone, are not a basis for finding a debt nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)" and "evidence of negligence or shoddy workmanship does not establish false representation with intent to deceive." *Id*.

The bankruptcy court then specifically examined the issue of workmanship insurance, relying on the following facts presented at the bankruptcy court trial:

> [Sims] stated that during that first meeting she asked the Debtor if he was "insured and bonded and had all of his licenses and everything." (Tr. at 174.) The Debtor responded that he had everything that was needed to build a house. She specifically recalled that she stated to the Debtor,
>
>> And I said, "Let me ask you this," and I said—I leaned across the table, and I said, "Not that I think that you're going to do a bad job or anything, but there's been so many people out here that have had so many problems building houses." I said, "Do you have workman insurance, so that if you do something wrong with the house, it is going to be fixed?" And he said, "Yes." And I said, "So," I said, not that I think you're going to do anything wrong, I'm sure you're a good contractor, I'm sure there won't be a problem." He said, "I treat all of my clients like family." He said, "I bend over backwards for them. I am there. I will do whatever has to be done. And I do have insurance, so that if there's some kind of workmanship issue, it would be covered."
>
> (Tr. at 174–175.)
>
> The Debtor recalled Sims asking if he had the necessary license and insurance to build a house and he stated that he did. He said there was no discussion of a builder's risk policy at the meeting but that it was discussed later on. (Tr. at 357.) According to the Debtor, when it came up later, he stated that, "It was not possible for us to be able to provide a builder's risk policy" because he was not the owner of the property and did not have a mortgage on the property. (Tr. at 357–358.) He said he never told Sims he had workmanship insurance and the issue of being bonded was never discussed.

*Id.* at 402.  In its analysis, the court focused on the following additional evidence presented at trial:

> Sims testified that she asked the Debtor if he had insurance which would cover workmanship and he responded that he did. This testimony was corroborated by her friend, Vivian Griffith. In fact, according to Sims' testimony the issue of whether the Debtor had workmanship insurance was one of the first issues she discussed with the Debtor even before she had procured a set of plans. (Tr. at 174.) The Debtor denied that he ever made such a representation. Even though Sims testified she was immediately concerned that workmanship insurance be procured she failed to insist that this request be added to the written contract. The Debtor said he has never heard of workmanship insurance. (Tr. at 357.)
>
> Mark Pruitt, an independent insurance agent, testified for the Debtor. He sold insurance to the Debtor in connection with his house construction business. He stated the Debtor needed general liability and worker's compensation insurance for a home construction business and the Debtor purchased this type of insurance from his agency. (Tr. at 300–301.) He explained that a builder's risk insurance is like a homeowners policy and is purchased by whoever has taken out the loan. During the course of construction it covers the dwelling itself as it is being built from the ground until it is completed and sold to the homeowner or converted to a homeowner policy. (Tr. at 308.)
>
> He also stated that "a lay person sometimes confuses insured and bonded, just because they've heard that advertised by people in the construction industry.... Usually, bonding means that they're—they're allowed to get permits through a city or state requirement.... Usually, it's—bonds are required with larger construction jobs, commercial construction jobs. I don't ever do them for residential, except for maybe city permit bonds." (Tr. at 309–310.)
>
> . . . .
>
> Sims' testimony concerning insurance on the other hand, seemed confused. She said the Debtor stated he already had builder's risk insurance (Tr. at 200), then she said she did not have to have builder's risk (Tr. at 202) because "Ryan had all the insurance that he was supposed to have." (Tr. at 201.) She admitted she was not sure what a performance bond was nor was there any discussion with the Debtor about the cost. (Tr. at 205.) She said the requirement for workmanship insurance was not in the written contract but there was an oral agreement that he would carry this type of insurance. (Tr. at 206–207.) Sims' testimony about the workmanship insurance is not persuasive. The only corroboration comes from the testimony of Sims' friend. The insurance agent testified that a performance bond is not used in home construction and Sims' never offered proof that "workmanship insurance" existed. Sims testified that she never saw any insurance, that it went directly to her

> bank and since the bank never said anything to her, she just assumed they had all the required insurance. (Tr. at 207.)

*Id.* at 407–08.

Based on the trial testimony, the court concluded that the plaintiffs had not met their burden of proof to show that the defendant-debtor had made the alleged misrepresentation about workmanship insurance in the written contract or as part of an oral agreement and that "the evidence [did not] establish[] that any statement about insurance caused the Plaintiffs' damage. The Plaintiffs' evidence established that the damage was the result of negligent or shoddy workmanship." *Id*. at 408.

Here, although the record reflects that the only reference to insurance within the Contract is the requirement for Plaintiffs to maintain a fire policy during construction, misrepresentations under § 523(a)(2)(A) are not required to be in writing, and verbal representations that Defendant made to Plaintiffs concerning insurance qualify under the statute. The proof presented is sufficient to support Plaintiffs' allegations that Defendant made representations about being insured, both on his website and during the initial meeting he had with Plaintiffs. The Court is also satisfied that Mr. Fuller expressly asked Defendant about being insured and that Defendant expressly answered that he was insured, which was true as to the general liability policy required by the State of Tennessee.

Whether that conversation was explicit as to the type of insurance Defendant maintained, however, is unclear, and a misunderstanding about a material fact does not equate to a misrepresentation of that fact. The Court is not convinced that Defendant expressly misrepresented to Plaintiffs that he maintained insurance on his workmanship, especially when Defendant testified that he knows of no such type of insurance. Mrs. Fuller testified that when she signed the Contract, her understanding about insurance was based on the website

information. She also testified that she relied on the conversation that she had had with Mr. Fuller after he spoke to Defendant – specifically, that Defendant would stand by his work just like his website said. Mr. Fuller testified that he asked Defendant about insurance for workmanship and that Defendant responded, "Don't worry about it." Mr. Fuller testified that although he clearly understood from Defendant that he had workmanship insurance and that it was "very significant" to Mr. Fuller's decision to enter into the Contract, the Contract itself contains nothing about Defendant carrying any kind of insurance. In addition, Mrs. Fuller signed the Contract for Mr. Fuller under a power of attorney. The testimony from all three parties leads the Court to conclude that Plaintiffs misunderstood and not that Defendant fraudulently misrepresented facts.

Moreover, even if the Court accepted Mr. Fuller's testimony about Defendant's representations concerning "workmanship insurance," Plaintiffs must also prove that Defendant possessed fraudulent intent in making any representation about such insurance. A defendant's fraudulent intent may be "inferred as a matter of fact" based on the totality of the circumstances, *i.e.*, defendant "can be fairly said to be 'blameworthy'" when he "makes a false representation which [he] knows or should have known would induce another to advance goods or services." *In re Copeland*, 291 B.R. at 759, 765-66 (citations omitted). In the Sixth Circuit, intent is determined under a subjective standard, *In re Rembert*, 141 F.3d at 281, which "requires that the trier-of-fact focus solely on the individual characteristics of the debtor . . . [but] still entails the utilization of circumstantial evidence given that a debtor will rarely, if ever, admit to acting in a fraudulent manner; helpful in this regard are many of the traditional indicia of fraud." *EDM Mach. Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (citations omitted).

>Circumstantial evidence of fraud is sufficient, but the court must have some evidence of the deceit or scheme to find fraudulent intent. *Cash Am. Fin. Servs. v. Fox (In re Fox)*, 370 B.R. 104, 116–17 (B.A.P. 6th Cir. 2007). Badges of fraud from which intent may be inferred include:
>
>>(1) the suspicious timing and chronology of events; (2) a debtor's lack of financial health at the time of the transaction (e.g., insolvency); (3) the failure to keep adequate records; and (4) the existence of unusual transfers. In utilizing such indicia, however, the Sixth Circuit has cautioned against "factor-counting," instead holding, "[w]hat courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent."

*Weaver v. Vollberg (In re Carlton Mark Vollberg)*, Adv. No. 1:17-ap-01009-SDR, 2017 WL 2787600, at *3 (Bankr. E.D. Tenn. June 27, 2017) (quoting *In re Marroquin*, 441 B.R. 586, 593-94 (Bankr. N.D. Ohio 2010) (internal quotations and citations omitted)). Thus, "a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A)." *In re Harrison*, 301 B.R. at 854. The intent analysis often comes down to a debtor's conduct before, during, and after the representations at issue and to the court's credibility determinations. *See In re Copeland*, 291 B.R. at 766.

    Simply, the record here does not unambiguously reflect that Defendant made a false material misrepresentation to Plaintiffs concerning insurance, and the evidence weighs in favor of a finding that Plaintiffs understood their questions about insurance to mean one thing and Defendant understood those same questions to mean another. In fact, Defendant did have insurance, as required by the State of Tennessee. Also, although Plaintiffs presented a great deal of evidence concerning the poor workmanship of the home, that evidence does not prove that Defendant possessed fraudulent intent when he entered into the Contract with Plaintiffs. Although § 523(a)(2)(A) does not require Plaintiffs to have pleaded fraud in their breach-of-contract case in the State Court Lawsuit, there are no references to fraud in the inducement,

workmanship insurance, or misrepresentations by Defendant in the Special Master's Report, which expressly states, "There was no testimony or proof offered of any warranties offered by the defendant." [Ex. 11 at p. 2.][7]  Additionally, the Special Master determined that "[w]hile [Defendant] did not personally create most of the defects, as the general contractor, he is responsible for the work of his subcontractors, and it is the view of the Special Master that his subcontractors exhibited very poor workmanship on the construction of [Plaintiffs'] home." [*Id*. at p. 14.]  Plaintiffs have not directed this Court "to any case precedent that equates proof of the performance of substandard work with proof of fraudulent intent.  Moreover, such a precedent could not feasibly exist without elevating every breach of contract action to a level of actionable fraud, as inherent in most contractual obligations for services is some guarantee as to the quality of the work to be performed." *In re Horton*, 372 B.R. at 358.  Under the totality of the circumstances from the proof presented at trial, the Court is inclined to conclude that Plaintiffs raised the alleged promise of workmanship insurance as a post hoc theory for purposes of § 523(a)(2)(A).

Further, Plaintiffs must prove justifiable reliance, *i.e.*, that they actually relied on false representations made by Defendant; that, based on the facts and circumstances they knew at the time, their reliance was justifiable; and that their reliance was the proximate cause of their losses.[8] *In re Morgan*, 415 B.R. at 649.  As with intent, a court's determination of whether the

---

[7] The Special Master's Report discusses Plaintiffs' requested relief under the Tennessee Consumer Protection Act and, in recommending that Plaintiffs not be awarded treble damages, states that Defendant "made representations to the Fullers that the house was properly constructed . . . .  This was simply not the case, and Mr. Givens knew, or should have known, that it failed to comply with standards of workmanship expected of new home construction. It was a close call on whether the Defendant willfully tried to cover up the multiple defects in the construction." [Ex. 11 at p. 21.]  These statements notwithstanding, nondischargeability under § 523(a)(2)(A) applies only to any representations that were made before Plaintiffs and Defendant entered into the Contract.

[8] Although these are separate elements, courts often analyze them together.

plaintiff actually relied and whether the reliance was justified is subjective, "based on the facts and circumstances surrounding each individual case." *In re Copeland*, 291 B.R. at 766-67. "To constitute justifiable reliance, the plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility." *Stewart Title Guar. Co. v. Roberts-Dude*, 497 B.R. 143, 151 (S.D. Fla. 2013) (citation, quotation marks, and brackets omitted). "Under this standard, a creditor will be found to have justifiably relied on a representation even though [it] might have ascertained the falsity of the representation had [it] made an investigation." *Com. Bank & Tr. Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001) (citations and quotation marks omitted).

After weighing the evidence presented at trial, the Court is not convinced that Plaintiffs' actually relied on any representation by Defendant about insurance. Mrs. Fuller testified that when they bought the Property, they talked with another builder about building a house. Because that builder required architectural drawings, which Plaintiffs discovered would cost at least $15,000.00, Plaintiffs searched the Internet and found Defendant, who did not require Plaintiffs to purchase architectural drawings. Instead, Mrs. Fuller testified that Defendant told Plaintiffs to draw what they wanted and he would build it. She also stated that she showed Defendant a book of house plans from which she identified three possibilities, and after Defendant told her which was the least expensive, she picked that plan. Notably, although the Special Master's Report includes a recommendation as to damages, it does not include any reference to what Plaintiffs now claim was detrimental reliance on Defendant's representations. It states, based on Mrs. Fuller's testimony there, that "she and her husband selected Mr. Givens as General Contractor after finding him via an Internet search. After meeting with him, Ms. Fuller stated that Mr. Givens told her that he did not require architectural drawing[s] and that he

told her to draw a plan for her." [Ex. 11 at 1.]  As previously discussed, the Special Master's Report also expressly states that "[t]here was no testimony or proof offered of any warranties offered by the defendant." [*Id*. at 2.]  The Court concludes from the trial record here that Plaintiffs' choice of Defendant to construct their house met Mrs. Fuller's primary goal of reducing expenses.

Critically, neither the Contract nor the numerous emails between Mrs. Fuller and Defendant reference any obligation of Defendant as to any kind of insurance.  Although the absence of any reference to insurance in their communications is not fatal to the reliance element of § 523(a)(2)(A), the failure to memorialize the understood promise in writing does not comport with Plaintiffs' approach to the relationship both before and after the Contract was executed so that the evidence weighs against a finding of justifiable reliance.  Plaintiffs' due diligence before entering into the Contract included a tour of one of Defendant's nearly completed projects.  Mrs. Fuller also emailed daily with Defendant during the construction of Plaintiffs' home, and she visited the construction site approximately four times each week, when she would instruct the workers if she saw issues that needed to be addressed.  Given Mrs. Fuller's active engagement with Defendant and attention to details, it seems incongruous that Plaintiffs would not have included the workmanship insurance as a material term of the Contract if it was as important then as they now say it was.

Based on the evidence presented at trial, after weighing the credibility of the witnesses, the Court concludes that Plaintiffs have failed to meet their burden to prove that Defendant actually made any misrepresentation, that Defendant possessed any fraudulent intent when he

stated to Plaintiffs that he carried insurance, or that Plaintiffs justifiably relied to their detriment[9] on any such statement.

### III.  CONCLUSION

Plaintiffs have not satisfied the elements of 11 U.S.C. § 523(a)(2)(A), and the Judgment entered on April 3, 2018, in the Sevier County Chancery Court was discharged on August 11, 2020.  A Judgment consistent with this Memorandum will be entered.

FILED:  August 30, 2021

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE

---

[9] Because the Court finds that Plaintiffs failed to prove other elements of their fraudulent misrepresentation claim, the Court need not reach the final element -- the requirement that justifiable reliance be the proximate cause of the loss. *See Sheen Falls Strategies, LLC v. Keane (In re Keane)*, 560 B.R. 475, 489 (Bankr. N.D. Ohio 2016) (stating that "proximate cause may be established by showing the conduct was a substantial factor in the loss, or the loss may be reasonably expected to follow").